536 A.2d 728

**Chadwick McGARR, A Minor, etc. et al.**

**v.**

**BALTIMORE AREA COUNCIL, BOY SCOUTS OF AMERICA, INC. et al.**

**No. 732, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Feb. 5, 1988.

Certiorari Denied June 16, 1988.

128

**130**

James P. Sullivan (Kidwell, Kent & Sullivan, on brief), Rockville, for appellants.

Phillips L. Goldsborough, III (A. Gwynn Bowie, Jr. and Smith, Somerville & Case, on brief), Annapolis, for appellee, Boy Scouts.

Allan A. Noble (Budow & Noble, on brief), Bethesda, for other appellees.

Argued before WILNER, ROBERT M. BELL and WENNER, JJ.

WILNER, Judge.

While on a camping excursion as a member of Boy Scout Troop No. 366, 11–year–old Chad McGarr was injured when he fell over a precipice into a partially frozen stream. In an action filed in the Circuit Court for Anne Arundel County, Chad and his mother contended that the accident occurred because of the negligence of troop scoutmaster Charles Fowler and the Baltimore Area Council, Boy Scouts of America, Inc.

The thrust of the McGarrs' complaint against Fowler was that the area where Chad fell was dangerous and that Fowler neglected to familiarize himself with the area, to warn Chad of the danger, and to give proper supervision to Chad. Liability against the Baltimore Area Council (BAC) was asserted on two bases: as owner of the land where the accident occurred and as a principal vicariously responsible for Fowler's negligence. At the request of the defendants, trial was bifurcated, the issue of liability being heard first by the jury. The court terminated that proceeding at the end of the plaintiffs' case, however, finding as a matter of law that (1) neither defendant was negligent and (2) Chad had assumed the risk of his injury and was contributorily negligent. This appeal ensued.

We find no fault with the court's conclusion as to BAC's vicarious liability. We think it erred, however, in its findings as to BAC's liability as the landowner, Fowler's innocence, and Chad's culpability; we shall therefore vacate the judgments and remand for a new trial.

## Standard of Review

■ In reviewing the granting of a motion for judgment that serves to withdraw a case from the jury, we must assume the truth of all credible evidence and all inferences of fact reasonably deducible from it tending to sustain the contentions of the party against whom the motion is granted. As pointed out in *Impala Platinum v. Impala Sales,* 283 Md. 296, 328, 389 A.2d 887 (1978),

"If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied."

This is particularly the case in an action based on negligence, for, as has often been stated:

"[M]aryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of

negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury."

*Fowler v. Smith,* 240 Md. 240, 246, 213 A.2d 549 (1965); *Moodie v. Santoni,* 292 Md. 582, 587–89, 441 A.2d 323 (1982); *Dalmo Sales of Wheaton v. Steinberg,* 43 Md.App. 659, 684, 407 A.2d 339, *cert. denied* 286 Md. 745 (1979).

It is against these principles that we must review the evidence presented to the Circuit Court.

### Background

The accident occurred on March 1, 1980, at the Lill–Aaron Straus Campground, a 900–acre campground near Hancock, Maryland, owned by BAC. Troop 366, led by Mr. Fowler, arrived around noon that day for an overnight excursion; it had received permission from BAC to camp at Tabler Lodge, one of several cabins on the campground.

Tabler Lodge sits on a peninsula, with the Potomac River to the south and Sideling Hill Creek to the north and east. It is a wilderness area, heavily wooded and hilly. From a contour map admitted into evidence, the lodge appears to be at an elevation of between 600 and 700 feet; the Potomac River, about 1,000 feet away, is at 420 feet; Sideling Hill Creek, which flows into the Potomac, would appear to be at about the same elevation, thus indicating a slope of about 180 feet between the lodge and the creek. The nature of the terrain, and in particular the slope from the lodge to Sideling Hill Creek, is further documented by a number of photographs in evidence.

Chad's application to become a scout was dated and filed the very day of the camping trip and showed him as a "New Boy Scout." Although he had been to two or three prior meetings of Troop No. 366, he had received no training or instruction in camping and had never before been overnight camping. He was told simply to bring warm clothes and certain "camping gear."

Mr. Fowler, though an experienced scout leader, had never been to Tabler Lodge and was unfamiliar with the area surrounding it. He, along with two other experienced adult campers, accompanied the 10–12 scouts to the campground, where he received a sketch map of the area. The sketch map shows no elevations and contains no warnings of dangerous areas. According to Mr. Fowler, at no time was he apprised of the specific nature of the terrain between the lodge and Sideling Hill Creek.

The group parked their cars at a ranger station and hiked up a dirt road through hilly terrain to the lodge. Once there, the scouts unpacked, gathered some firewood, and had lunch. After lunch, the scouts, led by some senior scouts, went hiking on a path parallel to the Potomac River. Mr. Fowler, apparently, remained at the lodge.

Chad knew only two of the other scouts—10–year old Chris Maxie and David Hummer. At some point on the hike, Chris became frightened because of the steepness of the grade and decided to return to the lodge. Chad agreed to accompany him. After informing the scout leaders, Chad and Chris turned around and walked back toward the lodge. According to Chad, as they got to the lodge, they saw Mr. Fowler, who "asked us to go get some firewood—kindling for the fire." He gave them no specific instruction as to where to go to get the firewood. According to Chad, he and Chris gathered and brought back two loads of wood. In the course of searching for a third load in the area between the lodge and Sideling Hill Creek, "Chris said he thought he heard some water and we were curious so we went—we went down to see where it was." [1]

The area, said Chad, was heavily wooded and covered with leaves and branches. Snow had begun to fall, making

---

1. Chris had a somewhat different recollection. He said that they did not stop at the lodge upon returning from the hike and did not see or talk to Mr. Fowler but kept walking past the lodge toward Sideling Hill Creek. Given the standard of review set forth above, we must accept Chad's account on this point.

the ground slippery. From Chad's and Chris's testimony and from the photographs in evidence, it appears that the land sloped away from the lodge, gradually at first and then more steeply. Chad said that they "had to walk side-to-side and slide some of the ways by holding on to the trees." At some point, they were sliding down on their backsides. Eventually, they stopped. Chad was just ahead of Chris and was holding onto a tree. He was apparently just at the edge of a 15- to 40-foot cliff but could not see the creek below. Other evidence in the case also indicated that, because of the trees and brush, the precipice was not readily visible.[2] Chris, however, said that he saw what "looked like there was a drop off and I couldn't see anything after that." He yelled to Chad not to go any farther. Chad said he heard Chris say something but could not hear what it was. Just then, the tree he was holding onto broke, and he fell over the cliff.

### Contributory Negligence/Assumption Of Risk

Normally, we would consider the defenses of contributory negligence and assumption of risk only after assuring ourselves that a case of primary negligence on the part of one or both defendants had been established. But as the standard of care applicable to primary negligence, particularly as to BAC, itself requires an examination of the reasonableness of Chad's conduct, we shall commence with that examination.

In concluding that Chad had assumed the risk of his injury and was contributorily negligent, the court laid great stress on the testimony of Chris Maxie, which, it said, "appears to be the more believable at that point and the more in keeping with the other facts in the case that has been presented to the court in the Plaintiff's case." We

---

**2.** Evidence as to obviousness of the cliff was in some dispute. A friend of Chad's mother, who visited the site sometime later, said that he could see the water when he was 30–40 feet from the edge. He was apparently standing erect at the time and was, presumably, taller than Chad. At the time of the accident, Chad was either in a sitting, prone, or supine position.

note at the outset that that kind of credibility determination was, of course, wholly inappropriate in considering motions for judgment at the close of the plaintiffs' case. The error was significant in at least two respects. In contrast to Chad's testimony, Chris said that he and Chad had not seen Mr. Fowler and were not out gathering firewood but were simply on a hike. Moreover, at some point after sliding down the hill, Chris was able to stop, apparently recognized the danger, and warned Chad not to go any farther. As we observed, however, at that stage of the case, the court was obliged to apply Chad's version of what occurred, not Chris's.

██ In either case, it is clear that the area was potentially dangerous. The ground was slippery, the slope became progressively steeper, ending in a precipice. There were no warning signs; no warnings had been given to the scouts. Chad and Chris—11 and 10 years old, respectively—were inexperienced scouts on their first overnight camping trip. They had been given no special training or instruction in hiking. Neither Chad nor Chris saw sufficient danger to deter them from starting down the hill, even from sliding down on their rear ends. That Chris—apparently the more cautious of the two given his reluctance to continue on the *approved* hike to the Potomac River—was able to stop a few feet from the precipice does not mean that Chad was necessarily "guilty" of contributory negligence or assumption of risk, at least not as a matter of law. As we indicated, Chad said that he could not see the precipice and that he did not venture further after a warning from Chris but simply fell off when the tree he was holding broke. Chris was able to climb back up the hill to summon help; had the tree Chad was holding not broken, there is nothing to suggest that he could not have done the same.

In this regard, Prosser and Keaton, *The Law of Torts* (5th ed. 1984), at 179, observe:

"[T]he capacities of children vary greatly, not only with age, but also with individuals of the same age; and it follows that no very definite statement can be made as to

just what standard is to be applied to them. To a great extent it must necessarily be a subjective one. The standard which is ordinarily applied, and which is customarily given to the jury, is to measure the child's conduct against what would be reasonable to expect of a 'child of like age, intelligence and experience.' There is something of an individual standard: the capacity of the particular child to appreciate the risk and form a reasonable judgment must be taken into account."

(Footnotes omitted.) In accord: *Restatement (Second) of Torts*, § 283A and comment b thereto; see also *Taylor v. Armiger*, 277 Md. 638, 358 A.2d 883 (1976), and cases cited therein. Note in particular the observation at 646, 358 A.2d 883: "The lowest age at which we appear to have held a child contributorily negligent as a matter of law is 11 years in *Kane v. Williams*, 229 Md. 59, 181 A.2d 651 (1962), where he was found to have ignored a stop sign applicable to him on a bicycle." Compare *Casper v. Chas. F. Smith & Son*, 71 Md.App. 445, 526 A.2d 87 (1987) (where we found that a seven and an eight-year old assumed the risk of their actions as a matter of law).

Taking the evidence in a light most favorable to Chad, we believe that, at worst, a jury question was presented as to whether, and at what point, the danger was a sufficiently obvious one to invoke the doctrine of assumption of risk and as to whether Chad's conduct, under the circumstances, was negligent.

### Liability of BAC as Landowner

In *Sherman v. Suburban Trust Co.*, 282 Md. 238, 241–42, 384 A.2d 76 (1978), the Court summarized the law governing a landowner's obligation to persons on his property thusly:

"Under existing Maryland law, the liability of a property owner to an individual injured on his property is dependent on the standard of care owed to the individual and that, in turn, is contingent upon a determination of the individual's status while on the property, *i.e.*, whether he is an invitee, licensee, or trespasser.... An invitee is

in general a person invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business; the owner must use reasonable and ordinary care to keep his premises safe for the invitee and to protect him from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover.... A licensee is generally defined as one who enters the property with the knowledge and consent of the owner but for his own purposes or interest; the owner owes no duty to a licensee under the traditional common law view except to abstain from wilful or wanton misconduct or entrapment."

(Citations omitted.) See also *Rowley v. City of Baltimore*, 305 Md. 456, 505 A.2d 494 (1986); *Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986).

Plaintiffs correctly point out that, in ruling on BAC's motion, the court never articulated whether it regarded Chad as an invitee or a licensee. We shall assume, for purposes of this appeal, that he was an invitee, thereby invoking the higher duty of care on the part of BAC.[3]

■ None of the critical elements stated in the standard of care applicable to invitees—reasonable and ordinary care, keep the premises safe, unreasonable risk, undiscoverability of the risk by the invitee—can be viewed in a vacuum or as abstractions. They take their meaning from the circumstances, and, in particular, from the nature of the premises and the invitee. The duty itself, of course, remains fixed; what vary are the measures needed to satisfy that duty. What is reasonable in one circumstance may not be reasonable in another. As the American Law Institute has observed in *Restatement (Second) of Torts*, § 343, comment e, "[i]n determining the extent of preparation which an

---

**3.** This is not merely a gratuitous assumption. There is evidence in the record that would support such a conclusion. It would have been helpful, however, if the court had made clear the standard of care it was applying when ruling on BAC's motion.

invitee is entitled to expect to be made for his protection, the nature of the land and the purposes for which it is used are of great importance."

Insofar as the "nature of the land" is concerned, it is self-evident that raw, unimproved, wooded, mountainous, virginal land—wilderness—presents quite different hazards, both latent and patent, than improved residential or commercial property. As noted in *Kimbar v. Estis*, 1 N.Y.2d 399, 153 N.Y.S.2d 197, 201, 135 N.E.2d 708, 710 (1956),

"One naturally assumes many ordinary risks when in the woods and in the country—trails are not smooth sidewalks, paths are not paved, trees, brush and insects are to be expected, and even snakes may appear occasionally. These and more are all a part of accepted camp life."

In accord is *Hersch v. Anderson Acres*, 146 N.E.2d 648, 649 (Ohio Comm.Pl.1957):

"The city dweller who chooses to spend his vacation in the great outdoors must in addition to accepting the fresh air and lake breezes assume the risks of the natural hazards of the outdoors such as flies, mosquitoes, snakes, poison ivy and other natural conditions not found in the urban communities."

See also *Walker v. Weymouth*, 154 Me. 138, 145 A.2d 90 (1958).

■ That does not mean, of course, that the owner of such land is completely absolved from all responsibility. One must also consider the purpose for which the land is used and the type of person likely to use it. See *Crohn v. Congregation B'Nai Zion*, 22 Ill.App.3d 625, 317 N.E.2d 637, 641 (1974).

■ The campground here was not owned by BAC for some unique private purpose, to the exclusion of others; it was used—perhaps exclusively—for Boy Scout camping trips. Indeed, the evidence showed that BAC solicited Boy

Scout troops to use it for that purpose.[4] BAC must have expected, then, that youngsters with varying degrees of outdoor camping and hiking skills would be roaming through the area, including the area near Sideling Hill Creek. It must have expected, or at least should have anticipated, that these children would not be under strict supervision all the time, that children from urban or suburban areas might become curious at the sound of running creeks, and that they might venture off to investigate them.[5] That carries with it some responsibility. As we held in *Pratt v. Maryland Farms Condominium*, 42 Md. App. 632, 639, 402 A.2d 105 (1979),

> "We note that in Maryland, while there is no doctrine of 'attractive nuisance' applicable to children who are trespassers or licensees ... a possessor of land must consider, in exercising reasonable care to make premises safe from any unreasonable risk of harm to his invitees, the capacity of children to understand dangers."

(Citation omitted.)

We do not suggest that BAC was obliged to alter the rugged topography of the land, to change its wooded condition, to erect extensive walls or fences, or to nail a warning sign to every tree. The fact is, however, that the area did present a danger to young, inexperienced hikers, one that, on this record at least, might not be immediately apparent to such hikers. To do *nothing*—to post *no* warning signs, to omit any mention of the danger to the scouts or even to the scoutmaster, and to leave the precipice without a guardrail of some kind—a jury could find constituted a failure to use reasonable and ordinary care to keep the premises safe

---

**4.** In order to use the campground, a Boy Scout troop must make an application, pay a $25 fee, and receive a tour permit.

**5.** Mr. Fowler conceded that "there's no way you can—can control—ten people every split second." See *Kosok v. Young Men's Christian Ass'n of Gr. N.Y.*, 24 A.D.2d 113, 264 N.Y.S.2d 123, 125 (1965), *aff'd* 19 N.Y.2d 935, 281 N.Y.S.2d 341, 228 N.E.2d 398 (1967).

for the young invitees and to protect them from injury caused by an unreasonable risk which the invitee, using ordinary care for his own safety, will not discover, i.e., negligence.

## Liability of Fowler

 There can be little doubt that, as scoutmaster of Troop 366, as leader of the expedition, and as the person to whom Chad's safety was entrusted, Mr. Fowler had a legal responsibility to take reasonable precautions for Chad's safety. See *Vest v. Kramer*, 111 N.E.2d 696 (Ohio App. 1951); *Coffey v. Hilands*, 42 Or.App. 193, 600 P.2d 466 (1979). Quite apart from the general legal duty owed by anyone who undertakes the supervision of a child (see 65 C.J.S. *Negligence*, § 63(60)), the Official Scoutmaster Handbook, published by the Boy Scouts of America and placed in evidence, states in the section on outings,

> "All Boy Scout outdoor activities must meet rigorous standards of health, safety, and program. Continued vigilance is necessary to ensure that Scouts have high-quality, outdoor experiences that do not expose them to unnecessary risks. *On unit outings as Scoutmaster you assume responsibility for the health and safety for the members of your troop. Adequate supervision of each Scout in your troop through verbal and visual communication is essential.*"

(Emphasis added.)

Mr. Fowler admitted his awareness of this duty. He acknowledged that "when you prepare for camping you'd better be right because your life sometimes depends on it" and that, when preparing to camp in the mountains, "you look to see what's around you; you look at your maps of your area and you make an assessment from that and work on that basis." In particular, he conceded, "[i]f you go into a new area that you haven't been before you should get advice from someone who has been there, or you should study what's available as far as topo maps and the likes."

Notwithstanding these acknowledgments, Mr. Fowler, who had not previously been to Tabler Lodge, did not surveil the area, did not have a topographical map,[6] and had not consulted anyone knowledgeable about the immediate area. Because "[w]e didn't intend to take any extended tours into the back country or anything like that," he felt that the "sketch map" he obtained from the ranger was sufficient. He knew nothing about the precipice, and indeed noted that, while shown on the topographical map, "unless you are looking specifically for it I doubt if there's one person in a thousand who would spot that particular thing as being as it really is."

It is against this background that we must consider Chad's assertion that, upon his return from the organized hike, Mr. Fowler instructed Chris and him to go out and gather firewood, without any direction as to where to go or not to go, without any warnings, and without any supervision. Considering that Chad and Chris were but 11 and 10 years old, totally untrained in outdoor scouting activities, a jury could well find that conduct to be negligent.

## Respondeat Superior

As noted, the plaintiffs sought to hold BAC liable not only for its own direct negligence as the landowner but also vicariously, on the theory that Fowler was acting as its agent. The evidence failed to support any such agency relationship, however. BAC is an umbrella organization; it charters individual troops and, as part of that annual process of initial chartering and charter renewal, tries to assure itself that the troop will have responsible adult leadership. But it does not choose or in any way directly supervise the scoutmaster, who is selected by the troop. In these circumstances, it is generally held that the council is

---

6. Fowler stated that, at some point prior to March 1, 1980, he had reviewed a map "similar to" the topographical map placed in evidence, but that he did not take it with him on the trip and that he probably did not discuss it with the individual scouts.

not vicariously liable for the negligence of the scoutmaster. See *Young v. Boy Scouts of America,* 9 Cal.App.2d 760, 51 P.2d 191 (1935); *Davis v. Shelton,* 33 A.D.2d 707, 304 N.Y.S.2d 722 (1969); Annot., *Liability Of Charitable Organization Under Respondeat Superior Doctrine For Tort Of Unpaid Volunteer,* 82 A.L.R.3d 1213, 1224-25 (1978).

### Bifurcation

 Four days before trial, the court granted BAC's motion to bifurcate the case and proceed with trial limited to the issue of liability. BAC's motion was based, in part, on the assertion that trial as to liability would take about one week, trial on damages would consume 2-3 weeks, and that, as of the date of the motion (less than three weeks before the scheduled trial date), depositions of the plaintiffs' damage experts had not been completed. The plaintiffs opposed the motion, urging that most of the witnesses expected to be called would be testifying as to liability.

The record does not reveal the basis for the court's ruling.

Md.Rule 2-503(b) permits the court, "[i]n furtherance of convenience or to avoid prejudice," to order a separate trial of any issue. The exercise of that power is a matter of discretion.

As we shall be remanding the case for a new trial as to both defendants, whether the court abused its discretion in bifurcating the first trial is of little moment. Should another attempt at bifurcation be made, the court can consider the matter in the light of the current circumstances, including our conclusion that, based on the plaintiffs' version of the event, liability is not so farfetched as the defendants suppose.

JUDGMENTS VACATED; CASE REMANDED TO CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR NEW TRIAL; APPELLEES TO PAY THE COSTS.