Justin GLOVER, By and Through Mary DYSON, his guardian ad litem, Plaintiff and Appellant,

v.

BOY SCOUTS OF AMERICA, Great Salt Lake Council, Inc., and Ronald Lunt, Defendants and Appellees.

No. 950207.

Supreme Court of Utah.

Sept. 13, 1996.

Jeffrey D. Eisenberg, Alan W. Mortensen, Salt Lake City, for plaintiff and appellant.

William J. Hansen, Karra J. Porter, Salt Lake City, for Boy Scouts and Great Salt Lake Council, Richard K. Spratley, Salt Lake City, for Lunt.

ZIMMERMAN, Chief Justice:

Justin Glover, by and through his mother and guardian ad litem, Mary Dyson, appeals the trial court's dismissal of his negligence claim after it granted summary judgment in favor of the Boy Scouts of America ("BSA") and the Great Salt Lake Council, Inc. ("Council"). The trial court ruled that because the BSA and the Council had no right to control the work of Glover's scoutmaster, and because the scoutmaster was not acting within the scope of his employment, the BSA and the Council could not be vicariously liable for the scoutmaster's negligence which injured Glover. We affirm in part and vacate in part.

▬ " '[I]n reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *Harline v. Barker*, 912 P.2d 433, 435 (Utah 1996) (alteration in original) (quoting *K & T, Inc. v. Koroulis*, 888 P.2d 623, 624 (Utah 1994)) (additional citations omitted). Because Glover was the nonmoving party, we state the facts in the light most favorable to him.

On the evening of September 11, 1991, Glover, a Boy Scout, attended a regular meeting of Boy Scout Troop 474 at the Bennion Heights Sixth Ward of the Church of Jesus Christ of Latter-day Saints ("LDS Church"). Defendant Ronald Lunt was the scoutmaster of Troop 474. At about 8:20 p.m., Lunt and the scouts left the church building to go home. Lunt went to the parking lot to get in his car while several scouts were skating on roller blades around the parking lot. Lunt agreed to let his thirteen-year-old son, who was also a scout, drive the one and a half blocks to their house while Lunt sat in the front passenger seat and another scout sat in the back seat. As the car left the parking lot, three scouts on roller blades, including Glover, grabbed onto the back of the car. Lunt twice told the scouts to let go, but they just laughed and grabbed onto the car again. Lunt then told his son to drive slowly. About one block from the church, Glover moved from the back of the car to the side of the car and then fell. The right rear tire of the car rolled over Glover's

head, and he allegedly sustained severe and permanent head injuries.

Glover brought this action against Lunt for negligence and also named the BSA and the Council as defendants on the theory that they were vicariously liable for Lunt's negligence under the doctrine of respondeat superior. Glover subsequently settled with Lunt, who agreed to the entry of a $650,000 judgment against him. Under the settlement, Lunt agreed to pay $10,000 outright plus the $100,000 maximum available under his personal automobile insurance policy and to assign his indemnity claim against the BSA's insurer to Glover. In the meantime, the BSA and the Council moved for summary judgment on the grounds that they did not have the right to control Lunt's scouting activities and, even if they did have that right, the accident did not occur within the scope of Lunt's volunteer "employment." The district court agreed with both contentions and dismissed Glover's suit. He now appeals.

■ We first state the applicable standard of review. "Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *K & T, Inc.*, 888 P.2d at 626–27 (citing Utah R.Civ.P. 56(c); *Higgins v. Salt Lake County*, 855 P.2d 231, 235 (Utah 1993)). "Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented." *Id.* at 627 (citing *Higgins*, 855 P.2d at 235; *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989)). " 'We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact.' " *Id.* (quoting *Ferree*, 784 P.2d at 151).

■ We first examine whether the district court correctly ruled that the BSA and the Council did not have the right to control Lunt's activities as a scoutmaster. This ruling was dispositive of Glover's claim because

to establish the BSA's and the Council's liability for Lunt's tortious conduct, Glover had to demonstrate that (i) an employer-employee relationship existed and (ii) Lunt was acting within the scope of his employment at the time the tort occurred. *See Averett v. Grange*, 909 P.2d 246, 249 (Utah 1996) (employer-employee relationship); *English v. Kienke*, 848 P.2d 153, 157 (Utah 1993) (same); *Bennett v. Industrial Comm'n*, 726 P.2d 427, 429–30 (Utah 1986) (same); *see also Jackson v. Righter*, 891 P.2d 1387, 1391 (Utah 1995) (scope of employment); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1056–57 (Utah 1989) (same). Whether an employer-employee relationship exists under the first prong of this test is determined by whether the alleged employer had the right to control the employee. *Averett*, 909 P.2d at 249. Thus, if neither the BSA nor the Council had the right to control Lunt, as the district court ruled, he was not their employee and they could not be found vicariously liable for his tortious conduct.

■ The right-to-control concept comes from agency law, the purpose of which is to define the limits of a master's vicarious liability for a servant's tortious conduct. *Bennett*, 726 P.2d at 430 n. 2; *see also* Restatement (Second) of Agency § 220 (1958) (outlining elements of right-to-control test). We have applied the right-to-control test most frequently when deciding whether a worker was an employee or an independent contractor for the purpose of determining whether the Workers' Compensation Act controlled the remedies available to an injured party. *See, e.g., Averett*, 909 P.2d at 249; *Gourdin ex rel. Close v. Sharon's Cultural Educ. Recreational Ass'n*, 845 P.2d 242, 244 (Utah 1992); *Bennett*, 726 P.2d at 429–31. In that context, we have identified several "main facts" which are helpful in determining whether an employer had the right to control an alleged employee. *Averett*, 909 P.2d at 249. These factors include (i) whatever covenants or agreements exist concerning the right of direction and control over the employee; (ii) the right to hire and fire; (iii) the method of payment (i.e., wages versus payment for a

completed job or project); and (iv) the furnishing of equipment. *Id.* (citing *Harry L. Young & Sons v. Ashton,* 538 P.2d 316, 318 (Utah 1975)). We have also stated that we may consider the intent of the parties and the business of the employer, in addition to compensation, direction, and control and that "no single factor is completely controlling." *Gourdin,* 845 P.2d at 244. However, we have consistently held that "whether an employer-employee relationship exists depends upon the employer's right to control the employee." *Averett,* 909 P.2d at 249.

The parties to the instant case do not rely primarily on our case law in the workers' compensation context, but instead on a number of cases from other jurisdictions which specifically address the liability of the BSA or a local council.[1] We assume they do so because several of the factors that our cases have identified as important in the workers' compensation context, including the method of payment and the right to hire and fire, are not easily applied to volunteers such as scoutmasters.

However, we have also had to determine whether a principal had the right to control an agent under the common law doctrine of respondeat superior. *Foster v. Steed,* 19 Utah 2d 435, 432 P.2d 60, 62 (1967). Our inquiry there was based on the general analytical model we use in applying the right-to-control test in workers' compensation situations, i.e., identifying specific facts which did or did not evidence the principal's right to control the agent. *Id.,* 432 P.2d at 62–63. In *Foster,* we held that a franchisor, Texaco, was not liable for the tortious acts of its franchisee, a service station, because the franchisor did not retain day-to-day control of the franchisee "but, rather, merely influenced the result to be achieved." *Id.,* 432 P.2d at 63. We considered the following facts in *Foster* determinative on the right-to-control question: (i) the relationship was covered by a lease and a sales agreement, each of which ran from year to year; (ii) the sales

agreement specified Texaco's obligation to deliver products to the station; (iii) the station paid its operating expenses, paid cash for the Texaco products, could buy products from sources other than Texaco, and could set its own retail prices; (iv) the station retained all profits and suffered all losses; and (v) the station could hire and fire employees, set its own hours of operation, and was not required to report to Texaco. *Id.* On these facts, we held that the franchisee was an independent contractor, not an agent of the franchisor. We therefore held that respondeat superior liability could not attach under such circumstances. *Id.*

*Foster* has many factual similarities to the instant case and is therefore most helpful in determining whether the BSA or the Council had the right to control Lunt's activities as a scoutmaster. The BSA and the Council submitted the affidavit of Martin W. Latimer, a scout executive with the Council, in support of their summary judgment motion. This affidavit states that BSA is a congressionally chartered charitable corporation which promotes scouting throughout the United States. To that end, the BSA publishes and makes available printed material dealing with scouting and charters approximately 390 local councils, which, in turn, promote scouting within a given geographic area. The Great Salt Lake Council is one such local council and has its own board of directors and officers.

According to the affidavit, scouting programs are provided through local community sponsors which apply for an annual renewable charter from the BSA through their local council. The BSA issues such charters to schools, churches, or other civic organizations. The charters authorize these community sponsors to run a local unit of Cub Scouts, Boy Scouts, or Explorers. The troop committee, scoutmaster, and other unit leaders are selected by the community sponsor, not by the BSA or local councils, and the community sponsor owns and operates the

---

1. We acknowledge that while the BSA and the Council rely primarily on case law from other jurisdictions, they do discuss *Foster v. Steed,* 19

Utah 2d 435, 432 P.2d 60 (1967), which we find most persuasive.

local unit. The BSA does not administer the "scouting program" but merely offers the program to local community sponsors that wish to use scouting to achieve their own goals and objectives with local youth. In addition, neither the BSA nor the local councils create, administer, or run individual scouting troops.

In the present case, the affidavit indicates that the BSA issued a charter to the LDS Church to own and operate Troop 474. Neither the BSA nor the Council selected Lunt or any other volunteers associated with Troop 474. The BSA and the Council had no advance knowledge of the troop meeting which took place on September 11, 1991, nor was the troop required to obtain permission from either the BSA or the Council to hold the troop meeting. Finally, neither the BSA nor the Council requires scoutmasters to drive scouts home after a regular troop meeting, and no official associated with either organization asked or expected Lunt to drive any scout home on the evening of the troop meeting.

In response to the affidavit, Glover submitted copies of (i) an application for volunteers to become scoutmasters or hold other leadership positions which is submitted to the community sponsor, the Council, and the BSA; (ii) an application for boys to join the Boy Scouts in which the BSA represents that the boy "is joining more than four million members of the BSA," that "major departures from BSA methods and policies" by community sponsors "are not permitted," and that "[l]eadership is restricted to qualified adults," as well as activity permit and health record forms; (iii) portions of BSA publications directing scoutmasters to wear specific uniforms and BSA and Council patches; (iv) portions of BSA handbooks and guides for scoutmasters which prohibit certain dangerous activities and specify certain rules for transporting scouts; (v) BSA and Council insurance policies covering scoutmasters; (vi) an application for permission to raise funds that a troop would submit to its local council; and (vii) portions of Lunt's deposition indicating that he received some scoutmaster training from the Council.

We have reviewed the materials submitted by Glover and agree with the trial court that they fail to raise a disputed issue of material fact regarding the BSA's and the Council's right to control Lunt's scoutmaster activities at a regular troop meeting such as the one which took place on September 11, 1991. These materials confirm that the day and time of troop meetings are set by the troop committee and that the community sponsor, through the troop committee, "is responsible for leadership, the troop meeting place, and related materials for troop activities." Even though the materials suggest that "a good troop meeting" usually includes certain general activities, such as opening and closing ceremonies, skills development activities, and games or contests, they also make clear that the scoutmaster is responsible for planning the specific content of individual troop meetings. Accordingly, we conclude that the BSA's broad suggestions and guidelines are insufficient as a matter of law to demonstrate the BSA's or the Council's right to control the day-to-day operation of regular troop meetings.

We also conclude that whatever training activities Lunt received from the Council are equally insufficient to establish the BSA's or the Council's right to control Lunt's activities at regular troop meetings. We confronted similar facts in *Foster*. In that case, it was undisputed that Texaco had established criteria for obtaining station operators, that the station operators attended a school at which they received instructions on marketing, operations, and safety, and that they were required to keep the station in a clean, safe, and healthful condition. *Foster*, 432 P.2d at 61. Nonetheless, we concluded that such facts were insufficient as a matter of law to demonstrate Texaco's right to control the day-to-day operations of the station. *Id.* at 63. Likewise, we conclude that the facts in the present case indicate that while the BSA and the Council influence the result to be achieved by regular troop meetings, these entities do not control the day-to-day operation of troop meetings.

Moreover, we find Glover's assertion that Lunt's uniform and patches are indicative of

a principal-agent relationship to be without merit. The plaintiff in *Foster* also relied on the wearing of Texaco uniforms and the use of Texaco insignia and signs, yet we held that the trial court erred in denying Texaco's motion for summary judgment. *Id.* at 61, 63. We therefore hold that the wearing of uniforms and patches is insufficient to create a material factual dispute as to the BSA's and the Council's right to control Lunt's scoutmaster activities at regular troop meetings in light of the overall organizational structure adopted by the BSA. Likewise, the fact that the BSA or the Council may provide umbrella insurance coverage for volunteers such as Lunt has no bearing on whether the BSA or the Council retain the right to control Lunt's day-to-day activities at regular troop meetings.

Similarly, the BSA's rules and guidelines on transporting scouts fail to demonstrate the requisite right to control Lunt's transportation of scouts to and from troop meetings. First, the rules and guidelines are obviously directed to outings and trips apart from regular troop meetings. Second, they do little more than set forth minimum qualifications and rules that are largely coextensive with state law and common sense. For instance, the BSA *Health and Safety Guide* provides the following "general guidelines": (i) Drivers must obey state and local speed limit laws; (ii) drivers must possess a valid driver's license and be at least eighteen years of age; (iii) a driver must have a commercial driver's license to transport fifteen or more passengers in a single vehicle; (iv) daily trips must not exceed twelve hours and must be interrupted with frequent stops; (v) seat belts must be used; (vi) passengers must ride only in the cab of a truck; (vii) passengers should not ride on the rear deck of station wagons; (viii) all driving, except short trips, should be done in daylight; (ix) adequate property damage and liability insurance must be carried; and (x) vehicles must not travel in convoys. Noticeably absent

from Glover's evidence is any indication that the BSA or the Council has a policy governing when and how a scoutmaster is to transport scouts home from regular troop meetings. As a result, we conclude that such activity is left entirely to the discretion of the scoutmaster or the community sponsor. We therefore fail to see how these minimum qualifications and rules amount to a right to control the manner and method of Lunt's conduct in connection with troop meetings any more than would a franchisor's minimum contractual requirements that its franchisee be duly licensed and comply with applicable law.

Finally, when we consider that the BSA merely issues an annual renewable charter to the community sponsor, which then owns and operates a troop, organizes a troop committee, and selects the scoutmaster, it is apparent that the BSA and the Council act in a chartering and advisory capacity and do not retain the right to control day-to-day troop operations.[2] It is true, as Glover asserts, that our case law suggests that " '[i]t is not the *actual* exercise of control that determines whether an employer-employee relationship exists; it is the right to control that is determinative.' " *Averett,* 909 P.2d at 249 (quoting *Pinter Constr. Co. v. Frisby,* 678 P.2d 305, 309 (Utah 1984)). However, the basis for the right must be evident from the facts as they exist. Glover cannot establish the basis for the right by merely speculating that under a different organizational structure the BSA and the Council could have retained the right to control scoutmasters at regular troop meetings. Such speculation is insufficient to create a genuine issue of material fact for purposes of a summary judgment motion. *Cf. Harline,* 912 P.2d at 439 (holding summary judgment appropriate when proximate cause of injury is left to speculation).

We note that our decision today is in accord with the vast majority of jurisdictions which have held as a matter of law that under the organizational structure described

---

**2.** Nothing in our opinion is meant to address the nature of the relationship between Lunt and the LDS Church, which was the community sponsor of Troop 474. The LDS Church was not made a party to this lawsuit, and the facts regarding its relationship with Lunt are not before us.

above, neither the BSA nor a local council has a right to control the conduct of scoutmasters in connection with troop activities that are not directly sponsored or supervised by the BSA or a local council. *See, e.g., Wilson v. United States,* 989 F.2d 953, 958–59 (8th Cir.1993); *Anderson v. Boy Scouts of Am.,* 226 Ill.App.3d 440, 168 Ill.Dec. 492, 494–95, 589 N.E.2d 892, 894–95 (1992); *McGarr v. Baltimore Area Council,* 74 Md. App. 127, 536 A.2d 728, 735 (1988); *Wilson v. St. Louis Area Council,* 845 S.W.2d 568, 571–72 (Mo.Ct.App.1992); *Davis v. Shelton,* 33 A.D.2d 707, 304 N.Y.S.2d 722, 724–25 (1969), *appeal dismissed,* 26 N.Y.2d 829, 309 N.Y.S.2d 358, 257 N.E.2d 902, 903 (1970); *Souza v. Narragansett Council,* 488 A.2d 713, 715 (R.I.1985); *Mauch v. Kissling,* 56 Wash.App. 312, 783 P.2d 601, 605 (1989); *see also Young v. Boy Scouts of Am.,* 9 Cal. App.2d 760, 51 P.2d 191, 193–94 (Dist.Ct. 1935) (dicta);[3] *cf. Riker v. Boy Scouts of Am.,* 8 A.D.2d 565, 183 N.Y.S.2d 484, 486 (1959) (holding local council liable for negligence of scoutmaster at program sponsored and conducted by local council). We are persuaded by these decisions as well as by our own decision in *Foster,* 432 P.2d at 62–63, that the trial court correctly concluded that Glover's claim against the BSA and the Council fails as a matter of law.

In sum, absent some evidence showing that the BSA and the Council have the right to control the manner and method of conducting regular troop meetings, Glover has failed to create a factual dispute as to whether Lunt was an "employee" of these entities on the facts of this case. We therefore affirm the trial court's grant of summary judgment on this ground. Because this ruling fully disposes of Glover's respondeat superior claim, we vacate the trial court's second ruling that Lunt was not acting within the scope

of his employment at the time the accident occurred. Having ruled that Lunt was not an employee of the BSA or the Council, it was and is unnecessary to consider whether he was acting within the scope of his employment.

Affirmed in part and vacated in part.

HOWE, DURHAM and RUSSON, JJ., and J. PHILIP EVES, Judge, concur in ZIMMERMAN's opinion.

Having disqualified himself, Associate Chief Justice STEWART does not participate herein; District Judge J. PHILIP EVES sat.

---

**3.** Glover relies on one of the few cases in the country in which a court refused to say as a matter of law whether the BSA exhibited sufficient control to establish a principal-agency relationship. *See Mayfield v. Boy Scouts of Am.,* 95 Ohio App.3d 655, 643 N.E.2d 565, 569 (1994). The court seemed most troubled by the fact that, according to the scoutmaster's affidavit, the BSA could discharge the scoutmaster "if it was deter-

mined that [he] was an atheist, a convicted felon, a homosexual, or if [he] registered females." *Id. Mayfield* is readily distinguishable because Glover presented no such facts in the instant case. Even if he had, we fail to see how the right to discharge on these specific grounds would in any way manifest the BSA's right to control the day-to-day operations of regular troop meetings.